1
2
3
4
5
6            **IN THE UNITED STATES DISTRICT COURT**

7             **FOR THE DISTRICT OF ARIZONA**

8

9    Sammy Joe Sanchez,                          No. CV-14-01903-TUC-RM (JMR)

10              Plaintiff,                        **ORDER**

11   v.

12   City of Tucson, et al.,

13              Defendants.

14

15        Pending before the Court is Defendants' Motion for Summary Judgment (Doc.

16   115).   Plaintiff's Complaint alleges claims of assault; battery; gross negligence;

17   negligence; negligent supervision, training, and retention; and excessive force in violation

18   of 42 U.S.C. §1983.   (*See* Doc. 1-4.)  Defendants' Motion seeks judgment on all but the

19   assault and battery claims.   (*See* Doc. 115.)   On June 2, 2016, Magistrate Judge

20   Jacqueline Rateau recommended granting in part and denying in part Defendants'

21   Motion.  (*See* Doc. 126.)  Plaintiff Sammy Sanchez and Defendants City of Tucson, Eric

22   Evans, Jason Garrels, and George Bravo filed Objections the Report and

23   Recommendation.  (*See* Docs. 129 and 130.)   This Court now considers Defendants'

24   Motion after a full and independent review of the record.

25   . . .

26   . . .

27   . . .

28   . . .

1   **I.      *Factual Background*[1]**

2          On January 27, 2013, Sarah Paoli-Sanchez called the Tucson Police Department

3   ("TPD") to report that her husband, Plaintiff Sammy Sanchez, had drunkenly told her that

4   he was walking down the street and was going to get his shotgun.  (Paoli-Sanchez Dep.

5   Tr. at 194:3-195:4.)  Ms. Paoli-Sanchez, who had previously left their shared home where

6   their children were sleeping because she did not want to fight with her inebriated

7   husband, traveled to her mother's apartment on West 36th Street.    (Paoli-Sanchez Dep.

8   Tr. at 192:20-193:6.)  At some point, seven officers arrived at the 36th Street apartment.

9   (Caballero Dep. Tr. at 44:24-45:45, 56:21-57:7; Bravo Civil Service Commission

10  ("CSC") Tr. at 76:18-25.)  Those officers included Sergeant Oscar Caballero and Officers

11  George Bravo, Jason Garrels, Eric Evans, Martinez, and Cantu.[2]  (Caballero Dep. Tr. at

12  56:21-57:7; Bravo CSC Tr. at 76:18-25.)  The officers determined that Plaintiff was not

13  at the 36th Street apartment, and Sergeant Caballero deployed all but Defendant Bravo to

14  the Sanchez home to ensure that the children were safe and to attempt to locate Plaintiff.

15  (Caballero Dep. Tr. at 55:18-19, 56:1-20.)  Sergeant Caballero ordered Defendant Bravo

16  to stay at the 36th Street apartment to guard Ms. Sanchez and her mother in case Plaintiff

17  returned.[3]  (Caballero Dep. Tr. at 57:8-13.)

18         Because Ms. Paoli-Sanchez's report included information that Plaintiff may be

19  armed with a shotgun, Defendant Bravo armed himself with his TPD AR-15 rifle.

20  Defendant Bravo was so armed because it is police policy to have someone armed with a

21  long gun when there is an indication that a subject is similarly armed.  (Bravo CSC Tr. at

22  5:11-15.)  This enables the officers to be equally matched with the suspected subject.

23

24         [1] In considering Defendants' Motion, the Court accepts as true all allegations
25  made by Plaintiff and makes all reasonable inferences in the light most favorable to
    Plaintiff.

26         [2] The record is inconsistent as to whether Lieutenant James Scott was present
27  when the officers first arrived at the 36th Street apartment. Officer Martinez and Officer
    Cantu's first names are not apparent in the excerpts of record provided to the Court.

28         [3] Sergeant Caballero did not receive training about how and when to deploy
    officers armed with long guns.  It is unclear if this was due to an absence of such training.

1  (Bravo CSC Tr. at 16-22.)

2      Officers who are authorized to carry long guns such as rifles receive special

3  training.  (*See* Caballero Dep. Tr. at 40:10-13.)  In support of this training, there is a

4  Patrol Rifle Manual, which establishes the protocol for using and maintaining rifles.

5  (Caballero Dep. Tr. at 35:23-136:10.)  This Manual and the companion training does not

6  instruct officers how to use lesser levels of force—for example, going "hands on" with a

7  subject—when they are armed with a long gun.  (Caballero Dep. Tr. at 14-24; Deputy

8  Chief Sharon Allen CSC Tr. at 31:2-8; Caballero Grievance Process Memorandum ("GP

9  Memo") at COT001349; Bravo CSC Tr. at 5:23-6:1, 7:9-17.)  Patrol officers in their

10  usual duties receive such instruction regarding the use of their handguns.  (Bravo CSC Tr.

11  at 6:21-7:8.)  Additionally, SWAT officers receive such training when they receive their

12  long gun training.  (Caballero Dep. Tr. at 136:22-24; Caballero GP Memo at

13  COT001349.)

14      At some point, Plaintiff arrived at the 36th Street apartment and began to walk

15  toward Defendant Bravo who was standing guard in front of Ms. Paoli-Sanchez's

16  mother's apartment.  Plaintiff was unarmed and it was clear to Defendant Bravo that he

17  did not have the shotgun that had been mentioned in the police report.  (Bravo TPD

18  Internal Affairs Interview ("TPD Interview") Tr. at COT000081:7-10.)  Defendant Bravo

19  yelled at Plaintiff to get on the ground three or four times.  (Sanchez Dep. Tr. at 141:1-6;

20  *see also* Kazmierczak Civil Service Hearing Tr. at 207:14-15.)  As Plaintiff began to

21  kneel down to comply with Defendant Bravo's order, Defendant Bravo struck Plaintiff in

22  the head with the butt of his AR-15.  (Sanchez Dep. Tr. at 141:15-142:11.)  Defendant

23  Bravo hit Plaintiff with the butt of his AR-15 three to four times, until Plaintiff began to

24  move away from Defendant Bravo.  (Sanchez Dep. Tr. at 143:22-144:6, 144:13-145:3;

25  Bravo Dep. Tr. at 115:24-116:18.)  Defendant Bravo believed that he had no other option

26  but to strike Plaintiff in the head with the AR-15 because Plaintiff would otherwise be

27  able to grab the rifle and use it against Defendant Bravo.  (Bravo Dep. Tr. at 117:4-

28  118:19; Bravo CSC Tr. at 48:1-50:25.)

1    Plaintiff retreated to a nearby stairway, sat down, and put his hands in the air.

2  (Sanchez Dep. Tr. at 145:7-12, 149:2-6.)  Defendant Bravo aimed his rifle at Plaintiff,

3  disengaged the manual safety, and yelled at Plaintiff that Plaintiff was going to die

4  tonight.  (Sanchez Dep. Tr. at 151:23-152:5; Bravo Dep. Tr. at 153:6-12, 153:15-21.)

5  Defendant Bravo radioed that Plaintiff was not complying.  (Sanchez Dep. Tr. at 149:6-

6  7.)  Plaintiff at some point started to respond that he was not doing anything and was not

7  fighting the officer.  (Sanchez Dep. Tr. at 149:12-14.)  Plaintiff was then cut off by

8  Lieutenant James Scott putting him in a chokehold from behind.  (Sanchez Dep. Tr. at

9  149:13-23; Scott Dep. Tr. at 23:3-5.)

10    Lieutenant Scott picked Plaintiff up while holding him in the chokehold and two

11  officers grabbed each of Plaintiff's arms.  (Sanchez Dep. Tr. at 153:10-13.)  Defendant

12  Evans held Plaintiff's left arm.  (Evans Dep. Tr. at 22:11-13.)  The three officers then

13  pulled Plaintiff down the flight of stairs.  (Sanchez Dep. Tr. at 153:15, 154:4-6.)  When

14  they got to the bottom of the stairs, Defendant Garrels yelled that he was going to tase

15  Plaintiff.  (Sanchez Dep. Tr. at 153:16-18.)  Defendant Garrels's probes lodged into

16  Plaintiff's chest.  (Clark Dep. Tr. at 51:3-4.)  As Defendant Garrels tased Plaintiff,

17  Lieutenant Scott, Defendant Evans, and the third officer let go of Plaintiff, allowing him

18  to fall face forward onto the ground.  (Sanchez Dep. Tr. at 155:3-16; Garrels Dep. Tr. at

19  44:12-14.)  The officers then handcuffed Plaintiff.  (Sanchez Dep. Tr. at 155:24-156:1.)

20  Defendant Garrels yelled that he was going to tase Plaintiff again and directed the other

21  officers to pick Plaintiff partially up so that Plaintiff's chest was off of the ground.

22  (Sanchez Dep. Tr. at 156:1-13; Garrels Dep. Tr. at 44:21-25.)  Defendant Garrels tased

23  Plaintiff a second time, and soon thereafter climbed onto Plaintiff's back and tased

24  Plaintiff a third time in drive-stun mode[4] on the left side of Plaintiff's rib-cage.  (Sanchez

25  Dep. Tr. at 157:16-159:5; Garrels Dep. Tr. at 45:3-17.)  The officers yelled at Plaintiff to

26  stop resisting and he tried to respond that he was not resisting and was not doing

27

28    [4] Drive-stun mode involves placing the taser directly on a person.  Alternatively, "dart mode," which Defendant Garrels used the first two times he tased Plaintiff, involves shooting the taser at a person, thereby releasing probes that lodge into the subject.

anything.  (Sanchez Dep. Tr. at 158:23-159:1.)  At this point, Defendant Evans began punching Plaintiff in his face.  (Sanchez Dep. Tr. at 159:2-5; Evans Dep. Tr. at 23:25-24:3.)

TPD investigated this incident to determine if any officer had behaved inappropriately.[5]  During the course of that investigation, several officers shared their understanding of a patrol officer's rifle.  Sergeant Caballero stated that he believes there are deficiencies in the training for patrol officers armed with long guns, particularly in the instruction they receive about defensive tactics.  (Caballero GP Memo at COT0001349.)  He has also stated that he checked the Patrol Rifle Manual and determined that it does not provide any instruction regarding using less than lethal force while armed with a rifle.  (Caballero Dep. Tr. at 135:23-135:3.)  Deputy Chief Sharon Allen confirmed that officers armed with long guns are normally deployed along with an officer armed with a lesser level of force, rather than being deployed alone.  (Allen CSC Tr. at 31:2-8.)  Chief Robert Villasenor stated that he believed it was a bad tactical decision to deploy an officer with a long gun alone, and that the fault of that decision lies with both Sergeant Caballero and Defendant Bravo.  (Villasenor CSC Tr. at 5:11-22.)

When deposed as part of this action, Plaintiff's expert witness Roger Clark testified that the officers involved acted contrary to instructions of the Arizona Peace Officer Standards and Training Board.  (Clark Dep. Tr. at 70:11-14.)  He also testified that he would have been concerned about hiring Defendant Bravo for a variety of reasons, including Defendant Bravo's habit of over-arming himself.  (Clark Dep. Tr. at 72:8-15.)

. . .

. . .

. . .

. . .

---

[5] Prior to this incident, Defendant Bravo received a ten-hour suspension for frustrating and lengthening a TPD investigation into a complaint of an officer's improper use of force.

1    *II.    Analysis*

2        *A.    Motion in Limine Ruling and Summary Judgment Evidence*

3        On July 8, 2016, the Magistrate Judge issued an Order (Doc. 98) on two defense

4    motions in limine (Docs. 60 and 63) seeking to preclude, among other things, the mention

5    of disciplinary action against Defendant Bravo and Sergeant Caballero.[6]   The Magistrate

6    Judge granted the motions, finding that the evidence of the disciplinary proceedings was

7    more unfairly prejudicial than probative.   (*See* Doc. 98 at 2.)   Specifically, the court

8    concluded that informing the jury that TPD found Defendant Bravo in violation of TPD

9    rules would allow the jury to make improper inferences of Defendant Bravo's guilt.

10        The Report and Recommendation cites this ruling when discussing Defendants'

11    Motion for Summary Judgment.   It concluded that, because of the ruling, statements

12    made by various officers during the TPD disciplinary proceeding could not be offered as

13    evidence to rebut Defendants' argument that summary judgment is appropriate.   The

14    Order does not require such a conclusion.   The Order narrowly concluded that the

15    conclusions of the disciplinary proceedings and the punishment imposed would be

16    unduly prejudicial.   (*See* Doc. 98 at 2-3.)   The Order did not conclude that the statements

17    and opinions put on record during the proceedings were themselves inadmissible.   In fact,

18    the Order specifically stated that such evidence could be admitted during trial for

19    impeachment.   (*See* Doc. 98 at 5-6.)

20        "At the summary judgment stage [the court] do[es] not focus on the admissibility

21    of the evidence's form[;] instead[,] [the court] focus[es] on the admissibility of its

22    contents."   *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing *Block v.*

23    *City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Fed. Deposit Ins. Corp. v.*

24    *N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)).   Although the occurrence and results of

25    the disciplinary proceeding are inadmissible, the substantive statements made by the

26    various TPD are admissible.   This Court must therefore reject the portion of the Report

27    _____

28        [6] Neither party objected to this Order.   *See* Fed. R. Civ. P. 72(a) (discussing objections to a Magistrate Judge's order on a nondispositive matter).

and Recommendation finding that such evidence could not be considered. Upon its independent review of the record, this Court considers all of the evidence, including those statements and opinions made during the TPD disciplinary proceedings.

### B. Negligent and Grossly Negligent Excessive Force

The Report and Recommendation concluded that Defendants were entitled to summary judgment on Plaintiff's negligence and gross negligence claims for two reasons. First, the Report concluded, after examining other jurisdictions' law, that a negligence claim could not be based upon the same facts as an excessive force claim. Secondly, the Report conclude that the one exception to that rule, which allows for a negligence excessive force claim where it is disputed whether the force used was intentional or accidental, cannot apply here based upon the evidence presented. This Court rejects both conclusions.

An Arizona negligence action may not be brought against police officers for discretionary decisions made in their official capacity. *See Hulstedt v. City of Scottsdale*, 844 F. Supp. 2d 972, 1017 (D. Ariz. 2012) (citing *Landeros v. City of Tucson*, 831 P.2d 850, 851 (Ariz. Ct. of App. 1992) (detailing the common-law immunity granted to police officers for mere negligence)). Accordingly, Plaintiffs' negligence claim brought against the named TPD officers, is forbidden by Arizona law and must be dismissed.[7]

The Arizona courts have concluded that only where police officers act *grossly* negligent can they be liable for their decisions in using a challenged level of force. This Court concludes that there are facts in the record that may allow a jury to find that Defendant Bravo was grossly negligent in the level of force used.

Plaintiff alleges that Defendant Bravo and others were grossly negligent in their use of force. To decide this claim, a jury will need to assess the level of force used because there are different standards that govern when it is reasonable to use different

---

[7] Plaintiff's Complaint also contends that the City is liable for the negligence of its employees. Because this Court will dismiss the underlying negligence claim, the Court also dismisses the claim of negligence against the City on the basis of its officers' negligent use of force.

levels of force.  For example, the Supreme Court has held that an officer may only use deadly force when "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  The jury in this case will need to determine if Defendant Bravo used deadly force, and is thereby restricted by the *Garner* standard.

If the jury finds that Defendant Bravo did use deadly force, there is evidence from which the jury could determine that he did so not intentionally, but with gross negligence. Defendant Bravo testified in his deposition that he did not intend to use deadly force and took certain steps to attempt to lessen the amount of force used.  Specifically, Defendant Bravo testified that he "did not want [the head strikes] to be lethal" so he "held back" in his strikes and did not "follow all the way through with the strike . . . in order to minimize [the force.]"  (Bravo Dep. Tr. 116:19-117:3, 133:25-134:18.)    But, he has also made statements that he chose to use lethal force on Plaintiff and knew at the time of the incident that strikes to the head are considered lethal force.  (Bravo Dep. Tr. at 133:17-23, 137:2-25.)  These statements create a question of fact of Defendant Bravo's intent to use deadly force.  Because, based on this evidence, a jury could reasonably conclude that Defendant Bravo's use of deadly force was grossly negligent, there is sufficient evidence to allow Plaintiff's gross negligence claim to survive Defendants' Motion.

As to the remaining Defendants alleged to have been grossly negligent, the Court will grant Defendants' Motion.  While there is substantial evidence creating a dispute of fact regarding whether Defendants Garrels and Evans acted reasonably and thus can be held liable for assault, battery, and excessive force under § 1983, this Court has been presented with no evidence demonstrating any genuine dispute as to whether these Defendants acted intentionally.   The deposition excerpts provided to the Court demonstrate that both Defendants Garrels and Evans intentionally used various types of force against Plaintiff, and this Court will therefore dismiss the claims of gross

- 8 -

1    negligence against these Defendants.[8]

2               **C.     Negligent Supervision, Retention, and Training**

3          The Report and Recommendation determined that the proper standard to apply to

4    Plaintiff's claims of negligent supervision, retention, and training was the standard

5    pronounced in *Humana Hospital Desert Valley v. Superior Court of Arizona*, 742 P.2d

6    1382 (Ariz. 1987).   There, the Arizona Supreme Court considered certain evidence

7    offered to support a negligent supervision claim.   Specifically, the court considered

8    whether the plaintiff could "establish that [the defendant employer] knew or should have

9    known that [defendant employee] was not competent to provide certain care [or complete

10   certain duties] and that the [defendant employer's] failure to supervise the [defendant

11   employee] caused injury to the plaintiff." *Humana*, 742 P.2d at 1386.  Plaintiff objects to

12   the use of this standard.

13         Applying this standard, the Report and Recommendation concluded that Plaintiff

14   had presented evidence sufficient to withstand Defendants' Motion for Summary

15   Judgment on only the negligent retention claim.  Both parties objected.

16                 *1.*     *The* **Humana** *Standard*

17         Plaintiff objects to the use of the *Humana* standard arguing that it arose from law

18   suits against hospitals for their non-employee doctors.   This, by itself, does not

19   necessitate the conclusion that those are the only circumstances in which the standard can

20   be used.  Courts in this district have applied the *Humana* standard to a broader range of

21   circumstances, including in actions against municipalities based upon police officers'

22   conduct. *See, e.g.*, *Vasquez v. City of Phoenix*, Nos. CV-04-481-PHX-DGC, CV-05-608-

23   PHX-DGC, 2006 WL 1147716 (D. Ariz. May 1, 2006); *Williams v. City of Mesa*, No.

24   CV-09-1511-PHX-LOA, 2011 WL 836856 (D. Ariz. Mar. 9, 2011); *Palmer v. Savona*,

25   No.CV-10-08209, 2013 WL 4478945 (D. Ariz. 2013). *But see Petty v. Arizona*, No. CV-

26   15-01338-PHX-DLR, 2016 WL 4095835 (D. Ariz. Aug. 2, 2016).

27   _____

28        [8] The Court will also dismiss the claims of gross negligence against the City based upon these defendants' alleged gross negligence.

1    Plaintiff argues that *Boomer v. Frank* stated the proper standard for a negligent

2    action such as this.  *See* 993 P.2d 456 (Ariz. 1996).  The *Boomer* standard, however, is

3    not particularly on point.   *Boomer* involved a negligence action arising from a car

4    accident in which the driver had a driver's permit and was accompanied by a passenger

5    who had a driver's license.  *See Boomer*, 993 P.2d at 457-58.  The court found that the

6    licensed passenger had a duty to supervise the driver because an Arizona statute requires

7    a licensed passenger to be present while a permittee operates a vehicle.  *Id.* at 459-60.

8    Based on this conclusion, the court defined a breach of the statutory duty to supervise as

9    the standard Plaintiff here wishes to apply: "For [defendant] to have breached his duty, he

10   must have had a reason and an opportunity to act, have failed to adequately discharge his

11   duty to supervise, and have thereby contributed to the cause of the accident."  *Id.* at 461.

12   This standard, derived from a statute with no relevance to the instance case, is not

13   inherently more apt than that presented in *Humana*.  Ultimately, this Court finds the

14   source and subsequent use of the *Humana* standard more applicable to the issue at hand,

15   and thus will overrule Plaintiff's objection to its application.

16              ***2.     Negligent Supervision***

17       To survive Defendants' Motion for Summary Judgment on his negligent

18   supervision claim, Plaintiff must present evidence to show that (1) the City knew or

19   should have known (2) Defendant Bravo was unfit or not competent to perform his job

20   duties, and that (3) the City's failure to supervise Defendant Bravo caused injury to

21   Plaintiff.[9]  The Report and Recommendation concluded that Plaintiff did not offer any

22   admissible evidence to support this claim.

23       This conclusion, however, was based upon the Report and Recommendation's

24   finding that the various City employee statements criticizing the choice to leave Officer

25   Bravo alone while armed with a rifle could not be considered at this stage.  As this Court

26   _____

27       [9] The parties make no argument that the City was unaware of any of the facts that
     could lead a jury to find Defendant Bravo unfit.  Thus, in examining each of the three
28   negligent claims brought against the city, this Court determines if there is sufficient
     evidence to find Defendant Bravo incompetent and to find the City's actions caused
     injury to Plaintiff.

1    has discussed, that finding was improper; while the actual disciplinary proceedings have

2    been deemed inadmissible, the statements made during those proceedings may still be

3    admissible either upon direct questioning or impeachment.

4         Considering this evidence, this Court finds that Plaintiff has presented sufficient

5    evidence to withstand Defendants' Motion.  In particular, the City's failure to provide

6    certain training for patrol officers armed with long guns who may need to use less than

7    deadly force and for officers who deploy such officers may be found to demonstrate that

8    the City knew or should have known that Defendant Bravo was unfit for the duties

9    assigned to him on January 27, 2013.  A jury could also find that the City's failure to

10   supervise Defendant Bravo caused Plaintiff's injury.  Defendant Bravo testified that there

11   was nothing he could do but strike Plaintiff with his rifle because all other options would

12   have allowed Plaintiff to gain access to the rifle.  However, if the City had supervised

13   Defendant Bravo, in light of his lack of fitness, there would have been another officer

14   available to approach Plaintiff and use a lesser level of force.  Accordingly, this Court

15   denies Defendants Motion on Plaintiff's negligent supervision claim.

16                    **3.    *Negligent Retention***

17        Plaintiff's negligent retention claim requires evidence that (1) the City knew or

18   should have known (2) Defendant Bravo was unfit or not competent to perform his job

19   duties, and (3) the City's retention of Defendant Bravo caused Plaintiff injury.[10]  The

20   Report and Recommendation concluded that Plaintiff should be allowed to present this

21   claim to the jury because Defendant Bravo was previously disciplined for frustrating an

22   investigation into another officer's alleged improper use of force.  In addition to this

23   disciplinary action, Plaintiff offered evidence that Defendant Bravo displayed a habit of

24   over-arming himself by, among other things, significantly modifying his rifle.

25        Defendants argue that Defendant Bravo's disciplinary record does not demonstrate

26   _____

27        [10] Defendants point to Minnesota and Florida standards for negligent retention and
     argue that those standards should apply here.  (*See* Doc. 130 at 5.)  This Court rejects
28   Defendants' suggestion.  The Court has found no Arizona case that adopts those
     standards, and has found Arizona cases that apply the standard as detailed above.

1    a vicious propensity and, thus, Plaintiff's negligent retention claim must fail.[11]

2    Defendants base this argument on an apparent understanding that Defendant Bravo must

3    have been previously accused of using excessive force for the City to be held liable for

4    retaining him. While that fact pattern would certainly present a clearer case of negligent

5    retention, Plaintiff is correct that there is no specific requirement of such a showing.

6    Rather, by requiring a showing of causation, the standard requires the unfitness to

7    indicate that an injury such as Plaintiff's may occur.

8          This Court finds that a jury could reasonably find that Defendant Bravo was unfit

9    for his position due to his habit of over-arming himself combined with his demonstrated

10   disregard for the City's attempts to determine whether excessive force had been used.

11   Further, a reasonable jury could conclude that this unfitness demonstrated Defendant

12   Bravo's capacity and willingness to escalate encounters with individuals with his

13   extensive weaponry and to have little respect for the City's policy forbidding and

14   rectifying incidents of excessive force. By retaining Defendant Bravo, the City can be

15   found to have caused Plaintiff's injuries. The Court therefore denies Defendants' Motion

16   seeking judgment on Plaintiff's negligent retention claim.

17                        **4.    *Negligent Training***

18         To survive Defendants' Motion for Summary Judgment, Plaintiff must offer

19   evidence that (1) the City knew or should have known (2) Defendant Bravo and Sergeant

20   Caballero were unfit or incompetent to perform their duties, and (3) the City's failure to

21   train Defendant Bravo and Sergeant Caballero caused Plaintiff injury. Particularly

22   relevant here, Plaintiff must also have evidence that the employees the City allegedly

23   failed to sufficiently train committed a tort. *See Kuehn v. Stanley*, 91 P.3d 346, 352

24   (Ariz. Ct. App. 2004). Because Plaintiff has not alleged that Sergeant Caballero

25   committed a tort, Plaintiff cannot seek to hold the City liable for its negligent training of

26   Sergeant Caballero. This Court will thus disregard evidence of Sergeant Caballero's

27   _____

28         [11] Defendants do not address the evidence of Defendant Bravo over-arming himself.

- 12 -

1   training for the purposes of resolving Defendants' Motion on Plaintiff's negligent
2   training claim.

3       The Report and Recommendation concluded that Plaintiff had offered sufficient
4   evidence of the first two elements—(1) the City's knowledge of (2) Defendant' Bravo's
5   unfitness—but concluded there was insufficient evidence of the final element of
6   causation.  Plaintiff objected to the conclusion regarding causation.[12]

7       The Court finds that there is sufficient evidence from which a jury could
8   reasonably find that the City's failure to adequately train Defendant Bravo caused
9   Plaintiff's injury.  This is based upon Defendant Bravo's statements that he essentially
10  had no option but to use his rifle against Plaintiff, that patrol officers are not provided
11  training regarding how to use less than lethal force when armed with a rifle, and that
12  SWAT officers do receive such training.  Based on these facts, a jury could find that it
13  was the City's deficient training that resulted in Defendant believing he had no option but
14  to use potentially lethal force against Plaintiff.   Accordingly, the Court will deny
15  Defendants' Motion as to Plaintiff's negligent training claim.

16      **D.    *Section 1983 Liability***

17      Municipalities such as the City may be liable under 42 U.S.C. § 1983, but only for
18  the municipalities' own conduct.  *See Monell v. New York City Dept. of Soc. Servs.*, 436
19  U.S. 658, 690-95 (1978).  When a plaintiff seeks liability on the basis of a municipality's
20  failure to properly train its employees, the plaintiff must offer evidence that (1) the
21  municipality's training was inadequate, (2) that inadequacy evidences the municipality's
22  deliberate indifference to the rights of those with whom the municipality's officers will

23

24  _____

25      [12] Defendant did not object to the conclusions regarding the City's knowledge or
26  Defendant Bravo's fitness.   Accordingly, this Court reviews the Report and
    Recommendation as to those issues for clear error.  *See* Fed. R. Civ. P. 72 advisory
27  committee's note to 1983 addition ("When no timely objection is filed, the court need
    only satisfy itself that there is no clear error on the face of the record in order to accept
    the recommendation.").   Finding none, this Court adopts the Report and
28  Recommendation's conclusion that the City could be found to have known that
    Defendant Bravo was unfit.

1   come in contact,[13] and (3) that inadequacy caused, or was the moving force, behind the

2   plaintiff's injury. *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 769-70 (9th Cir. 1989)

3   (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-91 (1989)).

4       A training program will be said to be inadequate if it fails to "enable officers to

5   respond properly to the usual and recurring situations with which they must deal."

6   *Harris*, 489 U.S. at 391.  When considering this factor, courts must keep in mind that it is

7   not sufficient that any specific officer had insufficient training, or that the training could

8   be improved in a way that would have prevented the plaintiff's injury.  *See Harris*, 489

9   U.S. at 390-91.   Rather, claims such as these typically require the inadequacy to be

10  "program-wide" and to leave the officers unequipped to do their jobs within

11  constitutional bounds.  *See Lewis v. Sacramento Cnty.*, 98 F.3d 434, 447 (9th Cir. 1996);

12  *Connick v. Thompson*, 563 U.S. 51, 68-70 (2011).

13      An inadequate training program may evidence a municipality's deliberate

14  indifference in two ways.  First, a city may be found deliberately indifferent if "the need

15  for more or different training is so obvious, and the inadequacy [is] so likely to result in

16  the violation of constitutional rights."  *Harris*, 489 U.S. at 390.  This method of proof is

17  only applied in those circumstances where it is nearly a foregone conclusion, and at least

18  "highly predictable," that a failure to provide training will leave municipal employees

19  unequipped.  *See Connick*, 563 U.S. at 64-67; *Harris*, 489 U.S. at 390 n.10 ("For

20  example, city policymakers know to a moral certainty that their police officers will be

21  required to arrest fleeing felons.  The city has armed its officers with firearms, in part to

22  allow them to accomplish this task.  Thus, the need to train officers in the constitutional

23  limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so

24  could properly be characterized as 'deliberate indifference' to constitutional rights."

25  _____

26      [13] This factor—that the inadequate training evidences a municipality's deliberate
    indifference—is what transforms insufficient training into a policy or custom for which a
27  municipality may be liable.  *See, e.g.*, *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232,
    1250 (9th Cir. 2010); *see generally Monell*, 436 U.S. at 694 ("it is when execution of a
28  government's policy or custom . . . inflicts the injury that the government as an entity is
    responsible under § 1983.").

- 14 -

(internal citations omitted)).

Second, a city may be found deliberately indifferent where it "know[s] or should know [that the training program] has failed to prevent tortious conduct by employees." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).  With this method of proof, a plaintiff shows that the municipality has disregarded a "pattern of constitutional violations."  *Id.*

In either circumstance, liability attaches because the municipality is imputed with knowledge and is found to have made a conscious choice disregarding that knowledge. *See Harris*, 489 U.S. at 389; *Clouthier*, 591 F.3d at 1250; *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1194 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, No 12-56829, 2016 WL 4260955, *11 (9th Cir. Aug. 15, 2016).

As for the last factor—that the inadequate training program be the moving force behind a plaintiff's injury—a plaintiff must demonstrate more than "but-for" causation. *Brown*, 520 U.S. at 410.  Allowing this standard would broaden *Monell* liability to include claims based upon a theory of respondeat superior, an option that has always been explicitly foreclosed for those seeking to hold municipalities liable under § 1983. *Id.*

The Report and Recommendation concluded that the City of Tucson was entitled to summary judgment because there was no evidence to satisfy the second factor—that the inadequate training demonstrated the City's deliberate indifference.  Specifically, the Report and Recommendation concluded that there was no evidence of a pattern of tortious conduct that should have put the City on notice that their training was deficient, and there was no evidence indicating that the deficiency was so obvious as to otherwise say the City was deliberately indifferent.  The Report also concluded there was no evidence in the record to demonstrate that deficient training was a deliberate or conscious choice.  The Report and Recommendation made these conclusions after finding that several pieces of evidence could not be considered.  Plaintiff objects to these conclusions, and argues that the disregarded evidence not only should be considered when resolving

Defendants' Motion, but is also sufficient to demonstrate deliberate indifference.

As discussed above, this Court finds it appropriate to consider the evidence that will not be admitted through the reports and context of TPD internal investigations, but may otherwise be admissible.  In light of that ruling, the Court recounts the evidence relevant to Plaintiff's § 1983 claim.

It is Defendant Bravo's position that, given the dynamics of carrying a long gun, he had no other viable option than to strike Plaintiff in the head with his rifle.  Patrol officers, including Defendant Bravo, can be authorized to carry rifles or other long guns.  Such authorized officers receive specific training regarding, among other things, how and when to use their long guns.  This training, however, does not include any instruction regarding transitioning from a long gun to hands-on, or to otherwise use less than lethal defensive tactics while armed with a long gun.  The Patrol Rifle Manual also does not include any instruction regarding the use of less than lethal force when armed with a long gun.  In comparison, SWAT officers are trained in how to transition to less lethal uses of force while armed with a long gun.  And, patrol officers receive training for transitioning from their standard handguns to hands-on, or other less lethal force.  At least one TPD employee—Sergeant Caballero—has stated that the lack of training on this issue for patrol officers armed with long guns is a significant deficiency.

A jury presented with this evidence could conclude that the City's training for patrol officers armed with long guns was inadequate to a point of being deliberately indifferent to constitutional rights, and that this inadequacy was the cause of Plaintiff's injury.

As to the training's inadequacy, a jury could conclude the absence of training on using less than lethal force, as the circumstances may require, when armed with a long gun leaves officers unequipped to respond properly to the situations with which they must deal.  This conclusion may be bolstered by the fact that the City saw the value in providing the training to SWAT officers armed with long guns.

As to deliberate indifference, while the Court agrees with The Report and

1    Recommendation's assessment that there is no evidence that the city has disregarded a

2    pattern of tortious conduct resulting from the potential inadequacy, such a pattern is not

3    necessary for a showing of deliberate indifference.  As detailed above, a plaintiff may

4    also succeed in obtaining municipal liability if he can show that the need for this training

5    was obvious, such that it was highly predictable that the absence of such training will

6    result in constitutional violations.  A jury could conclude that it was not only obvious, but

7    known to the city that such training was necessary based upon the City's provision of

8    such training to similarly armed SWAT officers, as well as the City's provision of such

9    training to patrol officers in their use of handguns.  The existence of a deliberate choice

10   may be inferred based upon this evidence.  *See Gibson*, 290 F.3d at 1194 ("A jury may

11   infer that a municipality made such a deliberate choice 'when a municipal actor

12   disregarded a known or obvious consequence of his action.'" (quoting *Bd. of Cnty.*

13   *Comm'rs of Bryan Cnty, Okl. v. Brown*, 520 U.S. 397, 410 (1997))).

14            As to causation, if a jury accepts Defendant Bravo's testimony that because he was

15   armed with a rifle, he had no choice but to strike Plaintiff with it, they could find that the

16   lack of training in other choices was the moving force behind Plaintiff's injury.

17            This Court concludes that Plaintiff has presented sufficient facts to provide a basis

18   for municipal liability, and will therefore deny Defendants' Motion on this theory.

19   . . .

20   . . .

21   . . .

22   . . .

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

1   Accordingly,

2   **IT IS HEREBY ORDERED** that the Report and Recommendation (Doc. 126) is

3   **adopted in part** and **rejected in part**, as detailed herein.   Plaintiff's Objection (Doc.

4   129) is **overruled in part** and **sustained in part**, as detailed herein.   Defendants'

5   Objection (Doc. 130) is **overruled**.

6   **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment

7   (Doc. 115) is **granted in part** and **denied in part** as follows:

8   1.   Defendants' Motion is **granted** as to Plaintiff's negligence claim.

9   Plaintiff's negligence claim against Defendants Bravo, Garrels, Evans, and the City of

10  Tucson is therefore **dismissed**.

11  2.   Defendants' Motion is **granted in part** as to Plaintiff's gross negligence

12  claim.   Plaintiff's gross negligence claim against Defendants Garrels and Evans is

13  **dismissed**.   Plaintiff's gross negligence claim against the City of Tucson is **dismissed**,

14  except to the extent that the City may be held liable if Defendant Bravo is found liable for

15  gross negligence.

16  3.   Defendants' Motion is **denied** as to all other claims.

17  Dated this 30th day of September, 2016.

18

19

20  _____

21  Honorable Rosemary Márquez
    United States District Judge

22

23

24

25

26

27

28